# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4025 | **DATE** | 4/6/2001 |
| **CASE TITLE** | | Adams vs. RR Donnelley | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

## DOCKET ENTRY:

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]   Enter Amended Memorandum Opinion and Order. Plaintiff's motion to reconsider (0-1) is granted in part and denied in part. The Court's Memorandum Opinion and Order dated march 7, 2001 is vacated.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | number of notices | **Document Number** |
| | No notices required. | | | |
| | Notices mailed by judge's staff. | | APR 0 9 2001 date docketed | |
| | Notified counsel by telephone. | | | 99 |
| ✓ | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | | |
| | Copy to judge/magistrate judge. | | APR 0 9 2001 date mailed notice | |
| OR | courtroom deputy's initials | | Date/time received in central Clerk's Office | mailing deputy initials |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JONATHAN ADAMS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 98 C 4025 |
| | ) | |
| R.R. DONNELLEY & SONS, | ) | |
| a Delaware Corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| ********************************** | ) | |
| EDITH JONES, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 96 C 7717 |
| | ) | |
| R.R. DONNELLEY & SONS, | ) | |
| | ) | |
| Defendant. | ) | |

DOCKETED

APR 09 2001

## AMENDED
## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Defendant R.R. Donnelley & Sons is a printer and provider of information services and logistics. It is headquartered in Chicago and currently employs over 28,000 people throughout the United States. Plaintiffs are current and former African-American employees of Donnelley who have brought two separate suits, one alleging employment discrimination in violation of 42 U.S.C. §1981, and one claiming violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-2(a) & 3(a). Plaintiffs have moved to consolidate the cases and to certify classes representing several distinct groups. For the reasons that follow, the Court grants the motion to

99

consolidate and grants in part the motion for class certification.

## BACKGROUND

The named plaintiffs in *Jones v. R.R. Donnelley & Sons* consist primarily of African-Americans who lost their jobs as a result of the closing of Donnelley's Chicago Manufacturing Division (CMD) in 1993-94 and claim they were discriminated against in connection with the shutdown. The plaintiffs did not file charges with the EEOC; they filed suit in 1996, bringing only claims under 42 U.S.C. §1981. In later versions of the *Jones* complaint, a number of Donnelley employees from divisions other than the CMD joined as plaintiffs, raising challenges against the company's dealings with its African-American employees across the board. These plaintiffs, too, assert claims only under §1981.

The plaintiffs in *Adams v. R.R. Donnelley & Sons* come from a wide range of Donnelley divisions across the country. They allege in their amended complaint that Donnelley has discriminated against its African-American workers in every aspect of their employment since at least 1965. The *Adams* plaintiffs filed administrative charges of discrimination with the EEOC and then filed suit in 1998, raising Title VII claims of race discrimination and retaliation, after receiving "right to sue" letters from the agency.

In short, both sets of plaintiffs claim that Donnelley has had a company-wide pattern and practice of discriminating against African-Americans in all aspects of employment. They seek recovery of back pay; compensatory damages for emotional distress, mental anguish, and inconvenience; punitive damages; and reinstatement and/or front pay.

The plaintiffs seek certification of six classes, each dealing with a separate aspect of their claims against Donnelley. Both sides have made extensive submissions concerning the issue of

2

class certification. Plaintiffs obtained discovery from Donnelley concerning a broad range of employment-related data for the CMD and eight of the twenty-two or twenty-three Donnelley divisions currently in existence: corporate headquarters; Crawfordsville, Indiana; Des Moines, Iowa; Dwight, Illinois; Gallatin, Tennessee; Harrisonburg, Virginia; Lancaster, Pennsylvania; and Mattoon, Illinois.[1] Plaintiffs provided this data to a statistical expert who has analyzed it and provided an affidavit analyzing the data. Defendants have likewise submitted an affidavit from a statistical expert who has reviewed essentially the same data.

There are nearly 180 named plaintiffs in the two cases, most of whom are proposed as representatives of one or more of the proposed classes. Disconcertingly, the parties do not agree on the number of plaintiffs or their statuses at Donnelley:

*Adams*: Plaintiffs say there are 68 named plaintiffs in *Adams,* 51 of whom are or were hourly employees and 17 of whom are or were salaried; they say that 49 are current employees and 19 are former employees. By contrast, defendants say that there are 80 named plaintiffs in *Adams,* of whom 14 are or were salaried; they contend that 31 are current employees, 44 are former employees, and 5 never worked for Donnelley at all.

*Jones*: According to plaintiffs, there are 104 named plaintiffs in the *Jones* case, including 85 who lost their jobs because of the closing of the CMD, 14 who were discharged from other divisions, and 5 who are current employees and are also named plaintiffs in *Adams.* Defendants, however, say that *Jones* includes 99 plaintiffs: 83 who

---

[1] Plaintiffs sought discovery relating to all of Donnelley's divisions; Donnelley opposed this request. In October 1999, the Court permitted plaintiffs to take discovery concerning eight divisions in addition to the CMD.

were terminated in connection with the closing of the CMD; 8 who worked in other divisions; and 8 who defendant cannot confirm ever worked at Donnelley.

Defendants took the depositions of over twenty of the designated class representatives; both parties have submitted excerpts from these depositions in support of their respective positions regarding class certification. Plaintiffs have also submitted affidavits and interrogatory answers from certain of the named plaintiffs.

## PLAINTIFFS' MOTION TO CONSOLIDATE

The Court grants plaintiffs' motion to consolidate *Jones* and *Adams,* but at the present time consolidates the cases for pretrial purposes only. There is considerable overlap in the nature of the factual allegations made by the plaintiffs in the two cases, and a good deal of the discovery that plaintiffs have sought and will seek from defendants is likely to be common to both cases. The Court will decide at a later time whether and the extent to which the cases should be consolidated for trial.

## MISCELLANEOUS MOTIONS

Both sides have filed motions seeking to strike materials filed by the other side, or to impose discovery sanctions due to alleged non-compliance with the Court's orders. All of these motions are denied. The Court is dealing with a class certification motion, not the trial on the merits of the cases. It does appear that there have been some deficiencies in defendants' production of materials in response to plaintiffs' discovery requests and the Court's orders, but the Court believes that the materials plaintiffs have obtained have been sufficient to permit them fully and completely to address the issues involved in the class certification motion, and to permit the Court to decide that motion. Any deficiencies in discovery responses by either side

4

can and will be dealt with following the Court's determination of this motion.

For these reasons, the Court denies the following motions:

- plaintiffs' renewed motion for rule to show cause, for sanctions, and to strike the affidavit of Chris LaMantagna and defendant's expert report;

- plaintiffs' motion to strike documents not tendered in discovery; and

- defendant's motion to strike portions of plaintiffs' class certification motion, supporting memorandum, and exhibits;

Defendant's motion to supplement its appendix is granted.

## BACKGROUND CONCERNING
## MOTION FOR CLASS CERTIFICATION

1. **Plaintiffs' motion**

Plaintiffs seek certification of six separate classes:

(1) The CMD Shutdown Class, which concerns Donnelley's alleged practice of allowing white employees to transfer to other divisions in connection with the closing of the CMD but not providing African-Americans the same opportunities;

(2) The Status and Classification Class, concerning Donnelley's alleged practice of hiring and keeping African-Americans in non-regular categories of employment (*i.e.,* temporary, contingent and contract) which pay less, provide fewer benefits, and offer little or no job security;

(3) The Promotion Class, centering around Donnelley's alleged maintenance of a closed hiring system in which positions are not posted and white employees are promoted over qualified African-American employees;

(4)     The Compensation and Benefits Class, which involves Donnelley's alleged maintenance of a two-tier compensation system under which African-Americans receive lower pay than whites;

(5)     The Hostile Work Environment Class, concerning Donnelley's alleged practice of permitting a racially offensive atmosphere to exist in its divisions; and

(6)     The Discipline and Discharge Class, concerning Donnelley's alleged use of different levels of discipline for African-American employees versus white employees, which allegedly results in a greater number of African-Americans being discharged "for cause."

## 2.     Donnelley's business

Donnelley argues, and plaintiffs do not seriously dispute, that its personnel functions are highly decentralized. Since 1993, the company has operated over 40 manufacturing divisions and numerous sales offices in 33 states. It is organized into five business units: book publishing, merchandise media, financial services, magazine publishing, and telecommunications. Each unit has its own president and its own human resources vice president who reports directly to the business unit president. Each manufacturing division has its own human resources manager who reports directly to the director of that particular division.

The materials submitted by Donnelley indicate that each division sets its own personnel policies and makes its own decisions concerning the use of non-regular ("temporary") employees, promotions, performance evaluations, pay raises, discipline, and discharge. There is nothing to indicate that any of these policies or decisions are dictated or directed by company-wide standards or practices or that they are even subject to review on a company-wide level.

According to Donnelley, since 1993 the company has not maintained any established practices or manuals that set forth policies or standards concerning employee status, promotions, compensation, benefits, or discipline that are applicable company-wide. This is disputed by plaintiffs, who claim that the company manual that existed prior to 1993 remained in effect after that date (at least in some divisions); plaintiffs offer this to try to refute Donnelley's argument that personnel policies are decentralized. None of the policies contained in the manual, however, is claimed to have had a discriminatory purpose; though plaintiffs claim that some of the policies have had a discriminatory impact, this occurs only in the manner in which particular divisions administer personnel matters.

Donnelley's submission indicates that there is considerable variation in the way the various divisions handle certain types of personnel matters. For example, with regard to non-regular employees, Dwight hires only college students as "seasonal" employees; Crawfordsville, Des Moines, and Gallatin use temporary workers supplied by outside agencies; Mattoon and Lancaster sometimes use contract workers. Promotions are also handled differently. The employees at Des Moines are represented by a labor union, and promotions are governed by criteria in collective bargaining agreements. Some divisions use a procedure that includes a standardized system of multiple interviews by supervisors and co-workers using identified criteria. Certain divisions require racial and gender diversity to be taken into account in establishing the candidate pool. Some divisions require written justification when a more senior applicant is passed over for an opening. Similar variations exist in other personnel-related practices among different divisions.

## DISCUSSION OF MOTION FOR CLASS CERTIFICATION

Under Federal Rule of Civil Procedure 23, plaintiffs seeking class certification must show that the action meets the four requirements of 23(a) and the requirements of one of the subdivisions of Rule 23(b). Under Rule 23(a)(1)-(4), plaintiffs bear the burden of proving that the class is so numerous that joinder of all members is impracticable; there are common questions of law or fact; the representatives' claims are typical of those of the class; and the representatives fairly and adequately protect the interests of the class. *See, e.g., General Telephone Co. v. Falcon*, 457 U.S. 147, 156 (1982). Failure to meet any one of these elements precludes certification of the class. *See, e.g., Retired Chicago Police Association v. City of Chicago*, 7 F.3d 584, 596 (7th Cir. 1993).

Once Rule 23(a)'s prerequisites are satisfied, plaintiffs must establish one or more of the following grounds for maintaining the suit as a class action pursuant to Rule 23(b): (1) there is a risk of substantial prejudice from separate actions; (2) declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) common questions of law or fact predominate, and a class action is superior to other available methods of adjudication. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 163 (1974); *Alliance to End Repression v. Rochford*, 565 F.2d 975, 977 (7th Cir. 1977). In this case, plaintiffs propose certification under either Rule 23(b)(3) or a hybrid of Rules 23(b)(2) and (b)(3).

In evaluating plaintiffs' motion for class certification, the Court is not permitted to make a preliminary determination of the merits of the case. *See Eisen*, 417 U.S. at 177-78 ("We find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained

8

as a class action."). The Supreme Court's decision in *Falcon*, however, makes clear that the Court may have to look behind the pleadings, not to evaluate the merits of the case, but rather to determine whether Rule 23's criteria have been met. *Falcon*, 457 U.S. at 160; *see also Retired Chicago Police Association*, 7 F.3d at 598 (noting that some discovery may be necessary to determine whether a class should be certified).

In this case, there is no proper basis to certify a single overall class; among other things, there is no one issue of fact or law common to all of the class members. Indeed, though plaintiffs refer to their proposed classes as "subclasses," we do not understand them to argue that a single omnibus class should be certified. We will therefore refer to the proposed "subclasses" as separate proposed classes and will assess each separately under Rule 23.

## 1.    Rule 23(a) requirements

Rule 23(a)(1) requires that the class be so numerous that the number of potential plaintiffs cannot be practicably joined. Donnelley does not dispute that plaintiffs can meet this requirement with regard to the classes they propose.

Rule 23(a)(2) requires that there exist questions of law or fact common to the class, and Rule 23(a)(3) requires that the class representatives' claims be typical of those of the class. The requirements of typicality and commonality are closely related. *See Falcon*, 457 U.S. at 158 n. 13. Both "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

Rule 23(a)(2)'s commonality requirement does not require that all or even most of the

issues in the litigation be common issues; one common issue is enough. *See, e.g., Meiresonne v. Marriott Corp.*, 124 F.R.D. 619, 622 (N.D. Ill. 1989). To establish commonality in the context of race discrimination, the plaintiffs must "allege a 'nexus' or a 'unifying force' other than race between class representatives and the proposed members of the class." *Buycks-Roberson v. Citibank Federal Savings Bank*, 162 F.R.D. 322, 330-31 (N.D. Ill. 1995) (quoting *Falcon*, 457 U.S. at 157). Commonality exists "where the defendant has engaged in some standardized conduct toward the proposed class members." *Daniels v. Federal Reserve Bank of Chicago*, 194 F.R.D. 609, 613 (N.D. Ill. 2000).

As for the requirement of typicality, "[a] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (citations and internal quotation omitted). Typicality does not require that each proposed class member have suffered the same injury as the class representatives, and typicality may be found even when there are factual distinctions between the claims of the named plaintiffs and the claims of the other class members. *See Rosario*, 963 F.2d at 1018; *De La Fuente*, 713 F.2d at 232. Similarity of legal theory is more important than factual similarity. *See Harris v. City of Chicago*, Nos. 96 C 3406 & 96 C 7526, 1998 WL 59873, *5 (N.D. Ill. Feb. 9, 1998) (citing *De La Fuente*, 713 F.2d at 232). But it is well established that "a person of a given racial group may not represent other members of the group merely because they were all subjected to the same broad type of discrimination by a common employer." *Allen v. City of Chicago*, 828 F. Supp. 543, 551 (N.D. Ill. 1993). *See generally Falcon*, 457 U.S. at 156-59.

Rule 23(a)(4) requires that the named plaintiffs adequately and fairly represent the interests of the class as a whole. This determination has two elements: the adequacy of the named plaintiffs' counsel, and the adequacy of the named plaintiffs' ability to protect the separate and distinct interests of class members. *See, e.g., Retired Chicago Police Association*, 7 F.3d at 598. Donnelley has not contested the adequacy of plaintiffs' counsel, and the Court has no reason to doubt that plaintiffs' counsel will be able to represent fairly the interests of the proposed subclasses. A representative plaintiff is considered to be adequate if his or her claims are not antagonistic to, and do not conflict with, those of the class members. *See id.; Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992).

### a.   CMD Shutdown

The first proposed class consists of all African-American employees at the CMD who were discharged during the shutdown of that Division and were not transferred to another division; all the proposed class representatives are among the plaintiffs in *Jones*. In connection with the closing of the CMD, Donnelley terminated some 586 African-American employees from the CMD, nearly 30% of all the African-Americans who worked for the company nationwide. Plaintiffs contend that white CMD employees were given opportunities to transfer to other divisions that were not made available, at least not on an equal basis, to African-American employees. They have submitted anecdotal evidence to the effect that African-American employees were not made aware of a "clearinghouse" providing information about opportunities for transfer, and that other roadblocks were put in their way in seeking to transfer. Nearly 25% of all white CMD employees transferred to other divisions. By contrast, only a handful of African-American CMD employees (14, or 2.3%) transferred, and plaintiffs have

11

submitted evidence indicating that those who did so had to locate the jobs on their own, the jobs they obtained were for "temporary" status and/or at reduced wages, and they lost seniority and benefits. Plaintiffs statistical expert characterizes the probability that this disparity is due to chance as .0000000000000000000000000000019 – according to plaintiffs, similar to the odds of one person winning three times in a row a worldwide lottery in which every living person had bought a ticket.

Donnelley concedes that the claims of the members of the CMD shutdown class would be appropriate for class certification, *see* Dfdt. Resp. at 1, 56, except for one factor: it argues that the *Jones* plaintiffs' claims are untimely and that this should result in a denial of class certification. Donnelley has also moved for summary judgment in *Jones* on the same grounds. The claimed untimeliness of the named plaintiffs' claims, however, is not a proper basis to deny class certification. First, as we have already noted, class certification cannot be made to turn on the merits of the plaintiffs' claims. *Supra* at 8. Second, even if the named plaintiffs' claims are subject to a serious timeliness challenge, that issue is undeniably one that is common to the class members, and thus it does not undermine either the existence of a common issue or the typicality of the named plaintiffs' claims.

Even if it were otherwise appropriate to consider the merits of the named plaintiffs' claims, the Court would not consider Donnelley's timeliness arguments at this time. Judge Williams, to whom *Jones* was previously assigned, denied an earlier incarnation of Donnelley's summary judgment motion in August 1999, concluding that genuine issues of material fact existed and that a reasonable jury could find that the doctrine of equitable tolling saved the plaintiffs' claims. *Jones v. R.R. Donnelley & Sons*, No. 96 C 7717, 1999 WL 639180 (N.D. Ill.

Aug. 17, 1999). The case was reassigned to this Court in February 2000. Since that time, the Court's and the parties' efforts have been geared entirely toward the class certification issue. Donnelley had ample opportunity after February 2000 to renew its motion, but it failed to do so. Indeed, aside from asking the Court to reconsider Judge Williams' ruling on its own merits (which the Court declined to do), Donnelley never indicated to the Court at any time between February 2000 and the filing of plaintiffs' class certification motion in May 2000, or between that date and the filing of Donnelley's response to class certification in January 2001, that it intended to supplement the evidentiary record and renew its request for summary judgment. Thus plaintiffs were essentially blind-sided when, after many months of discovery focused on enabling Donnelley to respond to plaintiffs' class certification motion, Donnelley filed a renewed summary judgment motion.

Upon review of Donnelley's summary judgment motion and related arguments in opposition to class certification, it became clear to the Court that plaintiffs would be unable to respond appropriately without the lengthy period that would be needed to take the depositions of the persons whose affidavits Donnelley submitted in support of the motion and to seek affidavits on the timeliness issue from the numerous plaintiffs named in *Jones*. This almost inevitably would prompt Donnelley to insist on its right to depose the plaintiff-affiants. In short, if the Court were to take the suggested detour and deal with the timeliness of the *Jones* plaintiffs' claims before ruling on class certification, many more months would pass before we could return to the class certification issue. The case, already over three years old when it was reassigned to this Court and now four years old, would reach or approach its fifth birthday without a definitive determination of class certification – an unacceptable result in light of Rule 23's admonition that

13

class certification be determined "[a]s soon as practicable after the commencement of [the] action." Fed. R. Civ. P. 23(c)(1).

For these reasons, we have determined to defer briefing and consideration of Donnelley's summary judgment motion, and we do not believe that Donnelley's timeliness arguments affect the decision whether to certify the CMD Shutdown class.

Though Donnelley has, as we have noted, essentially conceded the propriety of class treatment of the CMD Shutdown class – it says the closing of the CMD "is precisely the type of action which lends itself to class treatment: a single employment decision affecting a large number of individuals in common," *see* Dfdt. Resp. at 1 – it nonetheless attacks plaintiffs' statistical evidence regarding the disparity between the significant percentage of white CMD employees who transferred to other divisions and the minuscule percentage of African-Americans who did so. Donnelley claims that only transfer rates for employees who applied for transfers should be compared. Besides the fact that this is precisely the type of "statistical dueling" that is not relevant to the class certification analysis, *see Caridad v. Metro-North Commuter Railroad,* 191 F.3d 283, 292 (2d Cir. 1999), Donnelley's argument ignores the fact that plaintiffs claim Donnelley withheld from its African-American employees information regarding transfer opportunities.

Donnelley also argues that the proposed subclass members were not interested in transferring to other divisions. This argument likewise goes to the merits of plaintiffs' claims and thus cannot appropriately be addressed at this point. In any event, it appears from Donnelley's submission that the issue of willingness to transfer is common to a significant number of class members and thus does not affect whether plaintiffs can satisfy Rule 23(a)'s

requirements.

Donnelley also challenges the adequacy of certain proposed class representatives. It argues that Evelyn Foster and Earlene Nicholson's claims are atypical of those of the class because both got jobs at other Donnelley divisions and had some knowledge of Donnelley's "clearinghouse" system for arranging transfers. The Court disagrees. Plaintiffs have offered evidence tending to show that it was only because of their own efforts that Foster and Nicholson learned of the clearinghouse and secured their transfers; accordingly, they still may be able to prevail on their claims that Donnelley made it more difficult for them as African-American employees to transfer than their white counterparts. This does not make their claims atypical, and it certainly does not render them inadequate to represent the interests of class members who did not transfer.

Finally, Donnelley has moved to strike Nicholson's affidavit and dismiss her as a class representative on the grounds that plaintiffs did not produce her for an additional day of deposition. The Court denies this request. Donnelley has failed to describe what it thinks it could have learned through a continuation of Nicholson's deposition that might have indicated that she is not a proper class representative. Donnelley had a sufficient opportunity to question Nicholson in connection with her class representative status; if it has a need to continue the deposition in order to deal with the merits of Nicholson's claims, it can do so at some later point.

In sum, the Court finds that the CMD Shutdown class meets the requirements of Rule 23(a).

**b.     Status and Classification**

The second proposed class concerns plaintiffs' claim that Donnelley systematically

employed African-Americans in temporary and other non-regular categories of employment that pay less and provide fewer benefits, and kept them in such positions, because of their race.

Donnelley employed significant numbers of employees categorized as "temporary," "casual," or other similar terms. These employees were paid less and had fewer benefits than regular employees. "Regular" employees at the CMD were defined as those who had worked two consecutive years without a break in service of more than 30 days. Plaintiffs say Donnelley took steps to prevent African-American employees from attaining this status by laying them off when they got close to meeting the criteria for regular employment. They contend that the average length of employment for African-American so-called "temporary" CMD employees was 11 years, and that some "temporary" employees worked as long as 25 years. Plaintiffs have also provided a statistical analysis of temporary employees at the other divisions they have surveyed, which according to their expert indicates that the percentage of temporary employees who were African-American was, through 1997 (but not thereafter), somewhat greater than the percentage of regular employees who were African-American.

### (1)   Chicago Manufacturing Division[2]

Plaintiffs have provided anecdotal and statistical evidence that could support a claim that a pattern and practice existed in the Chicago Manufacturing Division to hire and keep African-Americans in temporary employment. There were persons who were employed in the CMD as "temporary" employees for upwards of twenty years, allegedly without any real opportunity to

---

[2] The Court recognizes that plaintiffs did not seek certification of a separate CMD class or subclass, but the evidence supporting certification of such a class is so clear that the Court is addressing the matter on its own motion.

advance into permanent positions that provided better pay and benefits. Plaintiffs' statistical evidence indicates that African-Americans comprised 99% of the non-permanent workforce at the CMD after 1993 – 313 of 343 non-permanent employees. Their statistics expert says the probability of this being due to chance is similar to the infinitesimal probability discussed earlier concerning transfers after the CMD shutdown. In addition, and perhaps just as importantly, plaintiffs' statistical evidence indicates that these 313 non-permanent employees formed well over half of the total African-American workforce at the CMD.

Plaintiffs have met the requirements of Rule 23(a) with regard to a class of non-permanent employees at the CMD. First, it is undisputed that this class is sufficiently numerous that joinder of all members is not practicable. Second, there are questions of law and fact common to the class, primarily whether Donnelley had a pattern and practice of hiring and keeping African-American CMD employees in non-permanent positions and whether this violated their rights under Title VII.

Third, the named class members' claims meet the typicality requirement of Rule 23(a)(3). Donnelley argues that the claims of the proposed class representatives from *Jones* are atypical because they are time-barred; we reject this argument for the reasons discussed with regard to the CMD Shutdown class. It also contends that several of the proposed representatives from *Adams* eventually became permanent employees and thus did not suffer the same injury as the other class members. But each of these persons contends that his or her advancement was delayed because of the policies that plaintiffs challenge here. Though the particulars of each named plaintiff's claim no doubt vary to some extent, the typicality standard "does not require that the factual background of each named plaintiff's claim be identical to that of al class members;

17

rather, it requires that the disputed issue of law or fact 'occupy essentially the same degree of centrality to the named plaintiff's claim as to that of other member of the proposed class.'" *Caridad*, 191 F.3d at 293 (quoting *Krueger v. New York Telephone Co.*, 163 F.R.D. 433, 442 (S.D.N.Y. 1995)). That is certainly the case here.

Finally, the proposed class representatives from the CMD will adequately represent the interests of a class made up of African-American CMD employees. It is not clear which of plaintiffs' proposed class representatives were CMD employees, so we will address all of those whose adequacy is challenged. The fact that Janette Dotson, Evelyn Foster, Willie Leffridge and Earlene Nicholson became permanent employees does not undermine their adequacy as class representatives; all claim that they remained in temporary positions longer than their white counterparts. Further, the fact that Jeffrey White and Michael Evans were contract workers does not render them inadequate representatives, as contract workers are included in the class. Donnelley's attacks on Carl Selders' lack of knowledge, Jeffrey White's signing of a release form in connection with his termination, and Della Jackson's timeliness are similarly unavailing for purposes of the class certification analysis. These plaintiffs' claims are not antagonistic to, or in conflict with, those of the class members. These and any other proposed class representatives who worked at the CMD as temporary employees are adequate class representatives under Rule 23(a)(4). We leave it to the parties to sort out which of the proposed representatives are CMD employees and thus proper class representatives.

### (2) Company-wide

The Court reaches a different conclusion with regard to plaintiff's proposed company-wide "status and classification" class. Plaintiffs' statistical evidence indicates that African-

18

Americans were, through 1997, somewhat more likely that whites to be in non-permanent positions in the divisions other than the CMD as to which plaintiffs have thus far obtained discovery, though not to a degree anywhere near the statistical skewing at the CMD mentioned earlier. Plaintiffs have also provided the Court with precious little anecdotal information regarding African-American non-permanent employees at divisions other than the CMD. Because of the apparent differences in the ways in which the various Donnelley divisions dealt with the hiring and retention of temporary employees, the Court is not convinced that there is a thread that ties together the multifarious claims of temporary employees nationwide. In short, the requirement of typicality has not been met by any of the proposed class representatives with respect to a company-wide class. We will, however, assume for purposes of discussion that plaintiffs could meet Rule 23(a)'s requirements as to a company-wide class, so that we can consider whether such a class could be certified under Rule 23(b).

### c.     Promotion

Plaintiffs seek to certify a class of Donnelley's black employees who were allegedly denied promotions for which they were qualified. They have submitted anecdotal evidence from employees at various divisions indicating, among other things, that African-American employees were turned down for promotions and then had to train white employees with less seniority to do the same job; that African-American employees were told that they were missing a qualification necessary for the promotion, only to learn later that a white employee missing the same or some other qualification got the promotion; and that African-American employees were told that they could not be promoted for one year after receiving a disciplinary warning, when the same restriction was not applied to white employees. Plaintiffs have also submitted testimony

reflecting that promotional opportunities were not posted, leading to word-of-mouth promotions and selection of candidates from favored classes.

Donnelley argues that the claims of those claiming denial of promotions present distinct and individualized factual and legal issues, and that promotions are handled differently at different Donnelley divisions. It denies that personnel decisions including promotions are subject to any standardized policy and contends (without significant dispute) that since 1993 the company has permitted individual divisions to implement their own policies regarding promotions and other personnel matters. Plaintiffs have responded with evidence to suggest that individual divisions continued to employ some of the policies articulated in the company's standard practice manual that previously was in effect. But even if the manual's guidelines remained in effect after 1993, this is of no assistance to plaintiffs in the present context: the manual's policies are not discriminatory; they emphasize that personnel decisions must be made without regard to the employee or applicant's race. Thus the existence of the manual does not indicate any company-wide *discriminatory* policy or practice.

Based on this evidence, Donnelley contends that because promotion decisions are made in different ways in the various divisions, there is no common nucleus of fact and plaintiffs cannot establish commonality. *Cf. Meiresonne*, 124 F.R.D. at 624 (N.D. Ill. 1989) (finding that plaintiffs' claims of company-wide sex discrimination in promotions satisfied commonality where centralized all-male committee approved all promotion decisions); *Wynn v Dixieland Food Stores, Inc.*, 125 F.R.D. 696, 698, 700 (M.D. Ala. 1989) (certifying company-wide class where evidence showed that corporate management endorsed racial bias in the hiring process and that individual store managers had no authority to terminate full-time employees); *Kuenz v.*

20

*Goodyear Tire and Rubber Co.*, 104 F.R.D. 474, 477 (E.D. Miss. 1985) (finding that plaintiff satisfied Rule 23(a)'s commonality requirement in seeking certification of a nationwide class where evidence showed that local managers implemented corporate personnel policy at the local level).

Plaintiffs argue, however, that even without statistical evidence, Donnelley's decentralized personnel policies permit each division to make entirely subjective promotion decisions, which they contend has led to discrimination in promotions. Thus far, plaintiffs have been unable to conduct a statistical analysis of promotions as such, due to the way in which Donnelley's computerized database accounts for changes in employee status. They have, however, analyzed pay rate increases (which conceivably could serve as an indicator of promotions) for the years 1997 through 1999. Their expert contends that the data for those years shows that African-American employees were far less likely to receive pay raises than white employees. However, this data largely postdates the named plaintiffs' claims of discrimination; the original *Adams* plaintiffs filed suit in June 1998, after having filed charges with the EEOC in 1997, challenging conduct that had occurred prior to that time. Plaintiffs' data does not assist the Court (at least not much) in determining whether similar results occurred in earlier years – and plaintiffs' claims go back to 1965. According to plaintiffs, however, the existence of a subjective personnel system, plus the anecdotal evidence they have submitted, provides sufficient commonality to permit certification of a company-wide class.

There is persuasive authority supporting the proposition that the requirements of Rule 23(a) can be met, even for a company-wide class, with regard to a challenge to subjective decision making where the plaintiffs have statistical evidence of a pattern of discriminatory

21

outcomes. In *Caridad v. Metro-North Commuter Railroad*, the Second Circuit held that a company's delegation to supervisors of discretionary authority to make employment decisions without sufficient oversight gave rise to common questions sufficient to satisfy Rule 23(a)(2). Though noting that it would be "extremely difficult" to prove that the grant of discretionary authority results in a pattern or practice of discrimination (even more difficult with greater decentralization), the court held that existence of subjectivity does not preclude a finding of commonality in a proposed company-wide class. 191 F.3d at 291-92. This Court agrees. As the Supreme Court stated in *Falcon*, "[s]ignificant proof that an employer operated under a general policy of discrimination conceivably could justify a class ... if the discrimination manifested itself ... in the same general fashion, such as through entirely subjective decision making processes." *Falcon*, 457 U.S. at 159 n. 15, *quoted in Caridad*, 191 F.3d at 292. *See also Buycks-Roberson*, 162 F.R.D. 322 (N.D. Ill. 1995) (certifying class of African-Americans and persons located in primarily African-American neighborhoods who were denied home loans due to a subjective decision making process). But as the Second Circuit noted in *Caridad*, simply making a claim of discrimination arising from subjective decision making does not get a plaintiff over the Rule 23(a) hurdle; "class certification would not be warranted absent some showing that the challenged practice is causally related to a pattern of disparate treatment or has a disparate impact" on members of a protected class (though not necessarily as much as would be required to sustain the plaintiffs' burden at trial). *Caridad*, 191 F.3d at 292, 293. In *Caridad*, the court found that plaintiffs' statistical evidence indicating a pattern of discriminatory outcomes was sufficient to get plaintiffs over the Rule 23(a) hurdle for a proposed company-wide class.

Here plaintiffs do not have such evidence, at least not with respect to the proposed

22

promotion class. As we have indicated, their pay raise data largely postdates the conduct of which they complained in their EEOC charges and their complaint; and as plaintiffs recognize, data on pay raises is a relatively weak surrogate for data directly concerning promotions. The Court fully recognizes that this may be a result of the way in which Donnelley has kept its personnel data, but whatever the reason, the evidence necessary to establish the predicate for class certification has not been presented.

The Court rejects plaintiffs' argument that because their allegation of a company-wide practice must be taken as true, it is sufficient to permit class certification. We do not intend to certify a company-wide class based on a say-so, and nothing in *Eisen* requires this result. Indeed, as we have noted, *Falcon* makes it clear that the Court is entitled to (and sometimes must) go behind the pleadings in order to determine whether Rule 23(a)'s criteria have been met. Though the Court cannot, under *Eisen,* deny class certification based on its assessment of the merits of the plaintiffs' claims, plaintiffs must in a case like this submit evidence from which the Court can determine that there is some possibility or likelihood that a class-wide practice exists, that the named plaintiffs' claims are typical of those of the class, and that there is a nucleus of operative fact common to the class.

In sum, plaintiffs' proposed promotion class fails for lack of a showing of commonality and typicality. Because the failure to meet any one of Rule 23(a)'s requirements precludes certification of a class, the Court need not address the parties' arguments concerning the adequacy of the proposed class representatives. *Retired Chicago Police Association,* 7 F.3d at 596.

### d. Compensation and Benefits

Plaintiffs next seek to certify a class comprised of all African-American employees who from November 1992 to the present received lower wages or lower wage increases than similarly situated white employees. This proposed class overlaps to a significant extent with two others, one of which we have declined to certify (the proposed promotion class) and one of which we have found meets Rule 23(a)'s criteria in part (the proposed class of temporary CMD employees).

Plaintiffs have submitted statements from employees from a variety of divisions who claim that they have been paid at rates lower than those of similarly situated white employees. However, due to deficiencies in the data provided to them by Donnelley, plaintiffs have been unable to conduct a complete statistical analysis of pay data for similarly situated employees. They state that "[b]ecause of the incompleteness and unreliability of the data[,] Plaintiffs could not perform individual analysis to show that Plaintiffs are similarly situated to the white employees who are paid more." Pltf. Mem. 36. Rather, the only statistical analysis that plaintiffs have provided is one reflecting that in 1994 and 1995, the average pay of African-American hourly employees was approximately $1,500 lower than that of white hourly employees, and the average pay for African-American salaried employees was around half of that for white salaried employees. These statistics are not particularly meaningful without some analysis of the job categories involved. For present purposes, however, we will assume that plaintiffs' figures can properly be construed as indicating either that African-American employees are paid less than similarly situated white employees, or that they are disproportionately kept in jobs that are lower-paying to begin with, or both.

24

For the reasons discussed with respect to the proposed promotion class, in particular our discussion of the Second Circuit's decision in *Caridad,* the Court concludes that plaintiffs have met Rule 23(a)'s criteria with regard to this proposed class. Plaintiffs have offered evidence of a company-wide practice of delegated and subjective decision making, plus evidence of a statistically significant disparity of outcomes as between white and African-Americans, plus anecdotal evidence. Donnelley's arguments concerning the multitude of individual issues that it claims class certification would bring to the fore are best considered in the context of the Court's discussion of the factors under Rule 23(b).

### e. Hostile Work Environment

Plaintiffs next propose certification of a class of employees who were subjected to a racially hostile work environment. They assert that Donnelley's African-American employees were subjected to pervasive racial harassment and offer anecdotal evidence that white Donnelley employees at various divisions dressed up in Ku Klux Klan garb; African-Americans were subject to racial epithets; racist graffiti was left open and visible for long periods of time at eleven divisions; racist literature was distributed by white employees and left where African-Americans could see it; and African-American employees' tires were slashed. Plaintiffs further claim that management at the various divisions did little or nothing to prevent the harassment or punish the offenders and sometimes participated in the harassment.

A claim of a racially hostile work environment is an appropriate subject of class certification, for by definition (at least with respect to the types of allegations made here) it involves conduct targeted at a group. The issues of what occurred at a particular venue, whether it rose (or fell) to the level necessary to be actionable under the law, and whether the company

should be held liable because of the action or inaction of management provide a common nucleus of operative fact and law sufficient to satisfy Rule 23(a)(2)'s commonality requirement. *See, e.g. Warnell v. Ford Motor Co.*, 189 F.R.D. 383, 387 (N.D. Ill. 1999) (certifying class based on a hostile environment claim arising out of pervasive sexual harassment).

Donnelley argues that certification should be denied because there is no evidence of a common policy or practice of tolerance of racial harassment by managers. *See, e.g. Tutman v. WBBM-TV*, 209 F.3d 1044, 1048 (7th Cir. 2000) ("[A]n employer is not strictly liable under Title VII for sexual harassment perpetrated by its employees."). As we have stated, however, plaintiffs need not show that they are likely to prevail on the merits in order to obtain class certification. For present purposes, the testimony of employees that their complaints went unheeded is sufficient to show the existence of common issues, at least within a particular division.

On the other hand, plaintiffs do not allege that Donnelley's *corporate* management (as opposed to division management) condoned the alleged harassment in the divisions.[3]  Without that factor to link together the claims of employees at different divisions, the Court is not convinced that the claim of an employee enduring a hostile environment at Dwight would typify the experience of an employee in the Des Moines division to the extent required to satisfy Rule

---

[3]  There is only scant evidence that corporate management was even made aware of such harassment. Two of the plaintiffs who worked at the Gallatin, Tennessee division say they told a vice president for human relations about "discrimination" at some unknown date, and another plaintiff says that the corporate employees relations manager told her that in the year 2000 – long after these cases were filed – he had observed racist displays at some facilities. This evidence does not even begin to indicate a practice of tolerance of harassment by Donnelley's corporate management.

23(a)(3), or even that common factual or legal issues would exist as required by Rule 23(a)(2). Under the circumstances, there is no basis upon which to certify a company-wide hostile work environment class.

Plaintiffs may, however, be able to satisfy Rule 23(a)'s criteria on a division-by-division basis. At that level, the class members' claims have issues in common, and the representatives' claims are, or at least appear to be, typical of those of the class. Though the Court is disinclined to certify classes for Donnelley divisions outside of this District, plaintiffs do appear to claim that racially hostile work environments existed at the divisions at Dwight and Pontiac, Illinois; the CMD; and the Chicago Financial Division, all of which are located within this district.

Donnelley challenges, however, the adequacy of certain of the proposed class representatives. First, it argues that none of the *Adams* plaintiffs can serve as class representatives because they did not include hostile work environment claims in the administrative charges they filed with the EEOC. A class cannot be certified in a Title VII case unless a representative exists who filed an administrative charge including the type of claim that the class seeks to raise. *Ekanem v. Health & Hospital Corp.,* 724 F.2d 563, 572 (7th Cir. 1983); *Irvine v. American National Bank & Trust Co.,* 108 F.R.D. 12, 13 (N.D. Ill. 1985) (Rovner, J.).

Only one of the proposed representatives from *Adams* made any reference to a hostile work environment in their administrative charges. With the exception of Ron Norris, an employee at the Pontiac, Illinois division, each of the *Adams* representatives filed a charge that stated as follows:

> I believe that I have been discriminated against because of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended, on a continuing basis since approximately 6/18/82, and continuing to the present, in

that the company has engaged in a pattern and practice of denying me and other similarly situated blacks equal opportunity in hiring practices, disciplinary procedures, pay and other compensation, promotion opportunities, opportunities for training, and job growth within the company.

As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included within her administrative charge. *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 47 (1974). The purpose of this rule is to give the employer fair warning about what it is charged with and the opportunity to resolve the dispute outside of court. *Id.* at 44; *Cheek v. Western and Southern Life Insurance Co.,* 31 F.3d 497, 500 (7th Cir. 1994). Though a plaintiff is not required to allege in her administrative charge each and every fact that forms the basis of her claim, claims that were not included in the administrative charge may be raised in court only if they are reasonably related to the allegations of the charge and can reasonably be expected to grow out of an administrative investigation of the allegations in the charge. *Cheek,* 31 F.3d at 500. The Court agrees with Donnelley that under this standard, the *Adams* plaintiffs' hostile work environment claims fall outside the scope of their administrative charges. *Id.* at 503 (hostile work environment claim ordinarily not within scope of administrative charge alleging only other types of discrimination); *Cheek v. Peabody Coal Co.,* 97 F.3d 200, 202-03 (hostile work environment claim is outside scope of administrative charge asserting differential treatment in discipline and benefits based on gender). With the exception of Ron Norris, the *Adams* plaintiffs cannot serve as representatives of a Title VII class.

Norris, by contrast, made a charge in March 1997 that he had been harassed on account of his race, in that an anonymous plant employee caused a KKK hood to be delivered to Norris at work. It is questionable whether this single incident would give rise to a viable racial harassment

28

claim against the company. But at this stage, we are not evaluating the merits of the plaintiffs' claims. Norris may serve as the representative of a Title VII (and §1981) class with respect to the Pontiac division.

Plaintiffs point out that they have also proposed a number of class representatives from *Jones.* But as the Court understands it, the *Jones* plaintiffs did not file administrative charges at all and thus cannot serve as representatives of a Title VII class. Thus it would appear that any claims as to which they are the class representatives must be limited to claims under §1981. That does not necessarily affect the class' right to proceed, as hostile work environment claims are cognizable under §1981. *See* 42 U.S.C. §1981(b); *Witt v. Roadway Express,* 136 F.3d 1424, 1431-32 (10th Cir. 1998). We leave for another day determination of the effect limitation of the class claims to §1981 might have on the ultimate success of those claims.

For these reasons, the Court concludes that Rule 23(a)'s criteria have been met with respect to plaintiffs' hostile work environment claims under §1981 with respect to the Dwight and Pontiac divisions, the CMD, and the Chicago Financial Division; and under Title VII with respect to the Pontiac division. There are proposed representatives from these divisions who meet the requirements of Rule 23(a)(4) and are either already plaintiffs in *Jones* or are class members who could be added as named plaintiffs for this purpose. The Court directs the parties to submit to the Court within one week of this order a list of proposed class representatives for each of these divisions.

The Court declines plaintiffs' request to certify hostile work environment classes from divisions outside this District. Rule 23(b)(3) indicates that one of the factors that a Court should consider in determining whether to certify a class is "the desirability or undesirability of

29

concentrating the litigation of the claims in the particular forum." The Court is not persuaded that it makes sense, as a matter of judicial resource management, access to evidence, or convenience of the parties and witnesses, to pursue in this District separate class actions that focus on far-flung divisions of Donnelley.

### f. Discharge and Discipline

Plaintiffs' final proposed class comprises "[a]ll black employees of RR Donnelley who were discharged or disciplined allegedly for cause between November 1992 and the present." Pltf. Mem 40. Plaintiffs have introduced anecdotal and statistical evidence for their claim that Donnelley maintains a *de facto* two-tier discipline system whereby African-American employees are treated more harshly than white employees for similar infractions, in some cases contrary to company policy regarding the appropriate sanction. This alleged system, plaintiffs argue, results in more African-Americans than whites being terminated "for cause"; they have submitted statistical evidence reflecting that African-American employees were, to a statistically significant degree, more likely to be terminated for cause than white employees.

The arguments and authority set forth by the parties with regard to this subclass mirror those discussed above with regard to plaintiffs' promotions and compensation classes.[4] For the reasons discussed with respect to the proposed compensation class, the Court concludes that plaintiffs have met Rule 23(a)'s criteria with regard to this proposed class.

---

[4] Donnelley claims that the named plaintiffs' discriminatory discharge claims were not expressly listed in their administrative charges, and thus they cannot serve as class representatives on those charges. The Court finds, however, that these claims are sufficiently related to the plaintiffs' claims of discriminatory discipline (which were made in their administrative charges) to permit them to raise those claims in this Court.

### g. Summary

Plaintiffs have met the requirements of Rule 23(a) with respect to certification of classes of African-American employees not transferred in connection with the CMD shutdown; who were non-permanent employees at the CMD; who were subjected to hostile work environments at certain divisions; who were paid less than, or denied salary increases given to, white employees; and who were disciplined or discharged.

### 2. Rule 23(b)

The Court must next determine whether any of the proposed classes that have passed muster under Rule 23(a) meet the requirements of Rule 23(b).

Classes in employment discrimination cases used to be certified mainly under Rule 23(b)(2), which provides that a class may be certified without giving the members notice and an opportunity to opt out, where "the party opposing the class has acted or refused to act on grounds generally applicable to the whole class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Prior to 1991, a successful plaintiff in a Title VII case could obtain only back pay and reinstatement and/or front pay – which were considered to be forms of equitable relief – and there was no right to a jury trial in such a case. In 1991, however, a statute was enacted allowing plaintiffs in Title VII and other employment discrimination cases to seek compensatory damages beyond back pay and front pay, as well as punitive damages, and according both sides the right to a jury trial. 42 U.S.C. §1981a.

This change in the law has materially altered the landscape of class certification in employment discrimination cases. The Seventh Circuit has recently made it clear that class certification under Rule 23(b)(2) is appropriate only where the demand for monetary relief is

incidental to the request for equitable relief. *See Lemon v. International Union of Operating Engineers, Local No. 130*, 216 F.3d 577, 580-81 (7th Cir. 2000); *Jefferson v. Ingersoll International, Inc.*, 195 F.3d 894, 898 (7th Cir. 1999). That is not the case here.

Plaintiffs argue that *Lemon* and *Jefferson* allow for the possibility of certification of a Rule 23(b)(2) class in a case of this type so long as the court, pursuant to its authority under Rule 23(d)(2) & (5), provides notice to class members. The apparent advantage of this to plaintiffs is that it would take out of the picture Rule 23(b)(3)'s requirements that common issues predominate and that a class action is a superior method of resolving the dispute. The Court does not believe, however, that the Seventh Circuit's suggestion in *Lemon* and *Jefferson* was intended to permit plaintiffs in a case primarily involving damage claims to avoid consideration of whether a class action would be a manageable way to resolve the case. Even were this Court to follow plaintiff's suggestion, we would conclude that a class action would be unmanageable with regard to the company-wide classes proposed by plaintiffs.

Plaintiffs also propose bifurcation of the case into a Rule 23(b)(2) class for equitable relief and a Rule 23(b)(3) class for damages. Both *Jefferson* and *Lemon* state that such an approach should be considered. *See Jefferson*, 195 F.3d at 899; *Lemon*, 216 F.3d at 581-82. Because of the right to a jury trial, however, if we were to bifurcate the case in this manner, the damages phase would have to be tried first; otherwise the parties' right to a jury trial would be infringed. *See Lemon*, 216 F.3d at 582; *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500 (1959). Under the circumstances, it is not at all clear to the Court, and plaintiffs have not adequately explained, what advantages would exist in the hybrid approach. In any event, because the damages phase must be tried first, the Court would have to address at this time whether the

32

requirements of Rule 23(b)(3) have been met. So we proceed to that issue.

Rule 23(b)(3) states that class certification is proper where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

Donnelley argues that plaintiffs' demands for compensatory, consequential, and punitive damages make Rule 23(b)(3) certification *per se* inappropriate. Contrary to Donnelley's characterization, neither *Jefferson* nor the Fifth Circuit's decision in *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402 (5th Cir. 1988) hold that claims for compensatory damages in an employment discrimination case necessarily renders Rule 23(b)(3) certification inappropriate. Rather, *Jefferson* counsels that "[w]hen substantial damages have been sought, the most appropriate approach is that of Rule 23(b)(3), because it allows notice and an opportunity to opt out." *Jefferson*, 195 F.3d at 898. *See also Lemon*, 216 F.3d at 581 (noting that *Jefferson* instructs courts to consider Rule 23(b)(3) certification for all purposes where substantial damages sought).

Donnelley next argues that because of the wide variation in personnel practices among the various divisions, no company-wide classes should be certified. Though the Court certainly believes it may be possible in an appropriate case to certify a company-wide class involving a multi-division company, this is not an appropriate case with respect to the proposed company-wide status/classification, compensation/benefits, and discipline/discharge classes. It is almost beyond question that the myriad individual issues involved in trying those claims as class claims would completely overwhelm any common issues. Were the individual issues limited to

damages, we would not reach this conclusion; individuality in damages issues does not necessarily undermine the predominance of common issues, and there likely would be a proper way to structure a trial or trials to deal with those issues with a minimum of inefficiency and without doing violence to the parties' Seventh Amendment rights. But in this case, there is an entirely separate layer of individual issues, namely the variations in personnel practices among the various Donnelley divisions. Without even considering the variations in individual plaintiffs' circumstances, this extra layer of individual issues is sufficient to lead the Court to conclude that common issues do not predominate over individual issues with regard to the company-wide status/classification, compensation/benefits, and discipline/discharge classes, and that trial of those claims as class actions would be unmanageable.

The Court reaches a different conclusion with respect to the CMD shutdown and CMD temporary employee classes, as well as the division-specific hostile work environment classes that we have discussed. Each of these claims essentially involves a discrete employment decision or practice, allegedly directed at a finite group of employees, thus making litigation of these claims as class actions a superior way of fairly and efficiently determining the parties' disputes. Each is confined to a single division, thus eliminating the issue of inter-divisional variation. With regard to each of these classes, the Court concludes that a class action is a superior method of adjudicating the common legal and factual issues, because (among other things) a class action will avoid duplicative suits and thus conserve the parties' and the Court's resources. *See, e.g., Hubler Chevrolet, Inc. v. General Motors Corp.*, 193 F.R.D. 574, 582 (S.D. Ill. 2000).

Trial of the CMD shutdown claim will focus mainly on the common issues of what

opportunities and information Donnelley did or did not make available to African-American CMD employees; issues of individual plaintiffs' willingness to transfer and their damages are likely to be secondary, and damages can in all likelihood be determined largely on a formulaic basis (and even if not are not likely to be the major focus of the litigation).

With regard to the CMD temporary employee class, the trial will focus, with regard to liability, on whether Donnelley had a policy or practice of shunting African-American employees into non-permanent jobs and then hindering their advancement. There are likely to be individual issues regarding, among other things, individual workers' qualifications for permanent jobs, but again the Court does not believe that these or the damages issues will be the primary focus of the litigation.

Finally, with respect to the division-specific hostile work environment classes, the trials will focus on what was going on at the plants and when. Particularly in light of the relatively modest number of African-American employees at Dwight and the Chicago Financial Division, the individual issues, including whether and to what extent a particular plaintiff was exposed to the environment, and damages, do not predominate over the common issues. *See, e.g., Warnell v. Ford Motor Co.,* 189 F.R.D. 383, 387 (N.D. Ill. 1999) (certifying a class in a hostile work environment case)

As for each of these claims, the Court leaves for later determination how the trial or trials will be structured. At this juncture, the Court is persuaded that mechanisms can be developed to deal with these class claims efficiently, and without infringing any party's Seventh Amendment rights. *See generally In re Rhone-Poulenc Rorer Inc.,* 51 F.3d 1293 (7th Cir. 1995). The specifics of this can and should be determined at a later time, as the cases proceed closer to trial.

In sum, the Court concludes that plaintiffs have established that the CMD shutdown and CMD temporary employee classes, as well as the division-specific hostile work environment classes, meet the requirements of Rule 23(b)(3). Plaintiff's request for bifurcated certification is therefore denied as moot.

Plaintiffs have proposed a very large number of class representatives (around 80 for the CMD shutdown class). The Court questions why so many class representatives are needed; it would seem that at some point, the marginal benefit from adding additional class representatives is outweighed by the additional time and effort this may entail. The Court will address this matter with the parties as the case progresses.

## 3. The Class Opening Date

The parties dispute the appropriate opening date for the class. Plaintiffs argue that under the "continuing violation" doctrine, they are entitled to bring suit challenging all conduct that was a part of that continuing violation, even conduct that occurred outside the limitations period. Under this theory, plaintiffs argue, the statute of limitations for class members with respect to Title VII claims is not limited to 300 days prior to the filing of the initial charge of discrimination with the EEOC for the *Adams* plaintiffs or two years prior to filing the §1981 charge for the *Jones* plaintiffs.

Donnelley asserts that the opening date for the *Adams* plaintiffs should be August 23, 1996, or 300 days from the earliest EEOC charge. It also claims that the *Jones* plaintiffs' opening date should be November 24, 1994, two years prior to the filing of the §1981 complaint. Donnelley states that the continuing violation doctrine is irrelevant to a determination of who may be included in the class and cannot be used to extend membership in the class to individuals

36

whose claims are not timely according to the applicable limitations period.

The "continuing violation" doctrine allows a plaintiff to obtain relief for a time-barred act by linking it with an act that is within the limitations period; courts effectively treat such a combination of occurrences as a single, continuous act that ends within the limitations period. *See Selan v. Kiley*, 969 F.2d 560, 564-65 (7th Cir. 1992). The continuing violation doctrine generally applies in three types of cases: (1) those involving hiring or promotion practices, where the employer's allegedly discriminatory conduct takes place over a period of time, making it difficult to pinpoint the exact day of the "violation"; (2) cases in which the employer has an express, openly espoused policy that is alleged to be discriminatory; and (3) cases in which the employer has, for a period of time, purportedly followed a practice of discrimination, but has done so covertly, rather than by way of an open and notorious policy. *See EEOC v. Harvey L. Walner & Associates*, 95 C 1355, 1995 WL 470233, *5 (N.D. Ill. Aug. 7, 1995) (citing *Selan*, 969 F.2d at 565). The continuing violation theory has been held applicable only to include earlier claims for individuals rather than to add new parties. *See id. See also Dicker v. Allstate Life Insurance Co.*, No. 89 C 4982, 1990 WL 106550, *4 (N.D. Ill. July 12, 1990) ("Plaintiffs correctly assert that they may introduce evidence of any part of a continuing violation . . . [h]owever, the class may include only those employees who could have filed a charge with the [EEOC] at the time the plaintiffs filed their charges.").

It is unclear from the papers either to what extent the continuing violation doctrine applies to the claims as to which we have certified classes, or what the appropriate opening date for the certified classes should be. The Court will address this matter after further briefing by the parties.

### 4. Exclusion of Salaried Employees

Donnelley argues that salaried employees should be excluded from any class certified by this Court, primarily because salaried employees may be subject to different personnel policies, especially with regard to compensation, and they may not be adequate representatives of the class. Although Donnelley's argument likely had merit in the context of the three proposed subclasses already rejected by the Court (promotion, compensation, and discipline/discharge), it is unpersuasive given the classes the Court has certified. Presumably, whether an African-American employee was salaried or hourly, he or she would have been affected equally by the racial discrimination alleged with regard to the CMD shutdown or the hostile environments at the Dwight, Pontiac, and Chicago Financial Divisions, and the CMD. Further, salaried employees may be included in the CMD temporary employee class because they may have been temporary employees during the appropriate period.

### 5. Limitation of Classes to Divisions with Named Representatives

Finally, Donnelley argues that the certified subclasses should be limited geographically to those divisions where a designated class representative is or has been employed. The Court has already determined that the proposed promotions, compensation and discipline subclasses should not be certified. The subclasses that the Court has defined are sufficiently defined that there is no need to further limit them geographically.

### CONCLUSION

For the reasons stated above, plaintiffs' motion for consolidation is granted; the cases are consolidated for all pretrial purposes. Plaintiffs' motion for class certification is denied in part and granted in part. The Court certifies the following classes under Rule 23:

All African-American employees of R.R. Donnelley who were employed at the Chicago Manufacturing Division and who were discharged during the shutdown of that division and were not transferred to another Donnelley division;

All African-American employees of R.R. Donnelley who were employed at the Chicago Manufacturing Division at any time from November 1992 to the present as non-regular employees (including temporary, casual, contract, contingent, task force, etc.);

All African-American employees of R.R. Donnelley who worked at (a) the Dwight division; (b) the Pontiac division; (c) the Chicago Financial Division; or (d) the Chicago Manufacturing Division from November 1992 to the present and were subjected to racial harassment so pervasive as to create a hostile working environment ((a), (b), (c), and (d) are each separate subclasses).

Plaintiffs' motions for rule to show cause, for sanctions, and to strike the affidavit of Chris LaMantagna and defendant's expert report and to strike documents not tendered in discovery are denied. Defendant's motions to strike portions of plaintiff's materials, and to strike witness affidavit, dismiss witnesses as class representatives, and bar further affidavits are denied.

Defendant's motion to supplement appendix is granted.

Dated: April 6, 2001

MATTHEW F. KENNELLY
United States District Judge